962 F.2d 1517
 22 Fed.R.Serv.3d 1081, 74 Ed. Law Rep. 1073
 COMMITTEE FOR THE FIRST AMENDMENT, an unincorporated
association of students, faculty, and other members of the
university community of Oklahoma State University, including
the following members; Richard L. Cummings; Charles
Edgley, members of the faculty of Oklahoma State University,
individually and as members of the Committee for the First
Amendment; James Jude Gramlich; Amy L. Wilsey,
individually and as members of the Student Union Activities
Board; Kimberly McCoy, individually and as President of the
Student Government Association of Oklahoma State University;
Tad Cooper, individually and as a student at Oklahoma State
University; Mendle E. Adams, individually and as Campus
Chaplain for the United Ministry to Oklahoma State
University, Plaintiffs-Appellants,
v.
John R. CAMPBELL, individually and in his official capacity
as President of Oklahoma State University; H. Jerrell
Chesney, individually and in his official capacity as
Executive Secretary of the Board of Regents for the Oklahoma
Agricultural and Mechanical Colleges, and Carolyn Savage,
L.E. Stringer, Jack Craig, Austin Kenyon, Bill Braum, John
W. Montgomery, Jimmie Thomas, Robert D. Robbins, Ed Malzahn,
individually and as members of the Board of Regents for the
Oklahoma Agricultural and Mechanical Colleges; Ronald Beer,
as Vice-President of Student Services of Oklahoma State
University; Tom Keys, as director of the Student Union,
Defendants-Appellees.
 No. 90-5178.
 United States Court of Appeals,
Tenth Circuit.
 May 6, 1992.
 
 Laura E. Frossard, Tulsa, Okl. (Micheal Salem, Norman, Okl., with her on the brief), for plaintiffs-appellants.
 Burck Bailey, Oklahoma City, Okl. (Barbara G. Bowersox with him on the brief) of Fellers, Snider, Blankenship, Bailey & Tippens, for defendants-appellees.
 Before BALDOCK and McWILLIAMS, Circuit Judges, and DUMBAULD, District Judge.*
 BALDOCK, Circuit Judge.
 
 
 1
 "How much contrition should be expected of a defendant is hard for us to say. This surely is a question better addressed to the discretion of the trial court." United States v. W.T. Grant Co., 345 U.S. 629, 634, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953).
 
 
 2
 Plaintiffs sought declaratory and injunctive (and later monetary) relief against various defendants[1] in response to a decision by the Board of Regents (Regents) of Oklahoma State University (OSU) suspending the showing of The Last Temptation of Christ.[2] The Student Union Activities Board (SUAB) had scheduled the film for a three-night run (October 19-21, 1989) at the Student Union Theater. At a September 22 meeting, the Regents deferred a decision on whether to allow the controversial film to be shown pending advice as to whether an on-campus showing could be prohibited on the grounds of (1) excessive entanglement between a state university and religion, and (2) damage to the University's reputation due to offending a major segment of the Oklahoma Christian community. The Regents sought this advice through a series of ten multipart questions[3] authored by their executive secretary and directed to the university president.
 
 
 3
 Plaintiffs sought a temporary restraining order (TRO) so that the film could be shown. The district court denied a TRO, but scheduled a preliminary injunction hearing on October 12, 1989. At the hearing, the district court strongly intimated that judicial resolution of the issue would not favor Regents' suspension decision. II R. 25-26. However, the district court deferred ruling so that the Regents could meet again and reconsider the issue. The next day a majority of the Regents voted to rescind the suspension and leave further handling of the matter to the University administration.
 
 
 4
 After an October 18 advertisement for the film, the University administration directed SUAB to modify subsequent advertisements by deleting the phrase "Brought to you by the students, faculty and staff of OSU ..." and inserting the following disclaimer:
 
 
 5
 The showing of this film does not reflect an endorsement of its contents by the OSU Board of Regents or Oklahoma State University.
 
 
 6
 On October 19, 1989, plaintiffs filed an amended complaint seeking damages due to content-based censorship by the defendants. The altered advertisements appeared on October 19 and 20. Notwithstanding any of the above, the film was shown on the originally scheduled dates.
 
 
 7
 Subsequently, Defendants moved for summary judgment on several grounds including mootness and qualified immunity. Plaintiffs filed a partial response on the merits and urged the court to defer ruling pending discovery. Plaintiffs requested additional time pursuant to Fed.R.Civ.P. 56(f) to depose Defendants. On the merits, Plaintiffs argued that material issues of fact remained concerning the Defendants' propensity for content-based censorship and prior restraint of unpopular speech. Plaintiffs also claimed that the disclaimer and the alteration of their original advertisement represented a second and subsequent violation the First Amendment because it chilled SUAB members' right to free expression and constituted a negative endorsement of the film by SUAB at the insistence of the Administration.
 
 
 8
 The district court dismissed the Plaintiffs' action with prejudice, indicating that it was "not inclined to issue constitutional fiats in futuro" because it "presume[d] the parties ... will conduct themselves, constitutionally and morally, in an appropriate manner." I R. doc. 35 at 3. The district court refused to defer ruling on the summary judgment motion while Plaintiffs' engaged in discovery.
 
 
 9
 Plaintiffs sought reconsideration, arguing that material issues of fact remained concerning censorship at OSU. Plaintiffs submitted affidavits and other materials indicating that: (1) in late 1966, Professor Thomas J. Altizer[4] was invited to speak at OSU, but the invitation was withdrawn by the university president because of content, (2) in 1967, an alternative student newspaper, The Drummer, was screened for content and students were charged $10.00 per day for a distribution point at the university, (3) in November 1967, the Regents announced a formal ban on unapproved speakers on campus (the following speakers were invited by various groups, but disapproved by the university: Dr. Timothy Leary, Rev. Phillip Berrigan, Abbie Hoffman and Rep. Adam Clayton Powell, Jr.); (4) campus police disrupted and ended a 1967 debate on the Vietnam war held at the student union and also monitored an informal lunch group (Provos) which met at the student union, (5) in March 1967, the university president attempted to silence controversial faculty opinion by holding a secret meeting with four department chairs and telling them "to keep their departments quiet," and (7) all faculty members in the sociology department resigned given the atmosphere of suppression, which targeted outspoken or controversial faculty members.
 
 
 10
 The university speaker policy was challenged in Bullock v. Kamm, No. CIV-70-418 (W.D.Okla.) and resulted in a stipulated settlement and a new speaker policy. The 1970 policy, "Policies and Procedures for Extra-classroom Activities" (1970), does not specifically address films. See I R. doc. 6, ex. A. The 1970 policy was in effect during the actions concerning The Last Temptation of Christ.
 
 
 11
 The district court denied reconsideration on the grounds that the new summary judgment evidence was remote in time (1966-70) and involved individuals other than the present regents and university administrators. I R. Doc. 44 at 1-2. On appeal, the Plaintiffs contend that: (1) the Regents' voluntary cessation of their content-based prior restraint did not make the case moot, (2) summary judgment was improper because a genuine issue of material fact remained, and (3) the Regents' suspension of the film pending review was an unconstitutional prior restraint and was content-based censorship. Defendants have filed a motion to dismiss the appeal because the regents have adopted a "Policy Statement Governing the Extracurricular Use of University Facilities, Areas or Media for the Purpose of Expression (1991)," substantially revising the 1970 policy. Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm in part and reverse in part.
 
 
 12
 I. Was the summary judgment procedure appropriate?
 
 
 13
 Appellate review of a district court's summary judgment decision is de novo, but both courts apply the same standard in evaluating the merits of a summary judgment motion.[5] See Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Factual disputes about immaterial matters are irrelevant to a summary judgment determination. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We view the evidence in a light most favorable to the nonmovant; however, it is not enough that the nonmovant's evidence be "merely colorable" or anything short of "significantly probative." Id. at 249-50, 106 S.Ct. at 2511. The movant need only point to those portions of the record which demonstrate an absence of a genuine issue of material fact given the relevant substantive law. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552. If a movant establishes its entitlement to judgment as a matter of law given uncontroverted, operative facts contained in the documentary evidence, summary judgment will lie. See Anderson, 477 U.S. at 251, 106 S.Ct. at 2511. See also Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.' ") (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).
 
 
 14
 A movant is not required to provide evidence negating an opponent's claim. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552. Rather, the burden is on the nonmovant, who "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257, 106 S.Ct. at 2514. After the nonmovant has had a full opportunity to conduct discovery, this burden falls on the nonmovant even though the evidence probably is in possession of the movant. Id. In this case, the plaintiffs claim that they did not have a full opportunity for discovery. Summary judgment should not be granted "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." Anderson, 477 U.S. at 250 n. 5, 106 S.Ct. at 2511 n. 5. Rule 56(f)[6] allows a nonmovant to seek deferral of a summary judgment ruling pending discovery. Before reaching the merits of the mootness issue, we must first consider Plaintiffs' claims that the district court improperly denied its Rule 56(f) motion and subsequent Rule 59(e) motion containing evidentiary material bearing on summary judgment issues.
 
 
 15
 A. Should the district court have deferred ruling on the
 
 
 16
 summary judgment motion pending discovery?
 
 
 17
 Plaintiffs requested that the district court notify them, prior to ruling on the summary judgment motion, if it was inclined to deny their Rule 56(f) motion. In such an event, they wanted "oral argument and a short period of time to submit additional affidavits or other factual material prior to the Court's ruling on summary judgment." I R. doc. 22. The district court implicitly denied the Rule 56(f) motion and granted summary judgment, all without adopting Plaintiffs' suggested procedure.
 
 
 18
 We review a district court's denial of a Rule 56(f) motion for an abuse of discretion. Patty Precision v. Brown & Sharpe Mfg. Co., 742 F.2d 1260, 1264 (10th Cir.1984). "Unless dilatory or lacking in merit, the motion should be liberally treated." James W. Moore & Jeremy C. Wicker, Moore's Federal Practice p 56.24 (1988). A prerequisite to granting relief, however, is an affidavit furnished by the nonmovant. Pasternak v. Lear Petroleum Exploration, Inc., 790 F.2d 828, 832 (10th Cir.1986). Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2740 at 530 (1983). This includes identifying the probable facts not available and what steps have been taken to obtain these facts. See 6 Moore's Federal Practice p 56.24. In this circuit, the nonmovant also must explain "how additional time will enable him to rebut movant's allegations of no genuine issue of fact." See Meyer v. Dans un Jardin, S.A., 816 F.2d 533, 537 (10th Cir.1987); Patty Precision, 742 F.2d at 1264. Plaintiffs' submission in opposition to summary judgment contained in the record, I R. doc. 22 & 23, fails both independent requirements.
 
 
 19
 We have considered presumably unverified statements in attorney memoranda and found them wanting as grounds for a Rule 56(f) continuance. See Dreiling v. Peugeot Motors of America, 850 F.2d 1373, 1377 (10th Cir.1988); Weir v. Anaconda, 773 F.2d 1073, 1083 (10th Cir.1985). Notwithstanding, we agree with the Third Circuit that counsel's unverified assertion in a memorandum opposing summary judgment does not comply with Rule 56(f) and results in a waiver. See Radich v. Goode, 886 F.2d 1391, 1393-95 (3rd Cir.1989). "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." First Chicago Int'l v. United Exch. Co. Ltd., 836 F.2d 1375, 1380 (D.C.Cir.1988). Advocacy by counsel does not suffice for evidence or fact in the Rule 56(f) context. Radich, 886 F.2d at 1395.
 
 
 20
 Defendants moved for summary judgment on November 13, 1989. Plaintiffs were granted two extensions, until December 28, 1989, to respond. On December 28, Plaintiffs provided the following unverified explanation by counsel in support of a deferred ruling:
 
 
 21
 In particular, certain of the defendants, including defendant Campbell, need to be deposed. Additionally, because of the intervening holiday period, plaintiffs have been unable to completely gather affidavits that will establish the long history of censorship on the campus of Oklahoma State University. These affidavits are needed to fully demonstrate the need for a permanent injunction and appropriate procedural safeguards to assure that the First Amendment will not continue to be violated.
 
 
 22
 I R. doc. 23 at 2. Defendants moved for summary judgment on seven grounds, including qualified immunity,[7] yet Plaintiffs provide few clues as to how the additional time would have enabled them to rebut Defendants' factual allegations[8] or establish other disputed material facts. No explanation appears as to why President Campbell's deposition was essential and little explanation appears as to why Plaintiffs could not provide affidavits of unnamed parties, other than a general reference to the holiday season. The affidavits ultimately produced concern evidence to which both parties conceivably had access. Moreover, a vague reference to "a long history of censorship" suggests no more than a fishing expedition in progress. If the allegation of pervasive, longstanding, recurring and institutional censorship is true, plaintiffs certainly had ample time in which to allege specific acts of censorship. See Korf v. Ball State University, 726 F.2d 1222, 1230 (7th Cir.1984).
 
 
 23
 The district court was not required to inform the Plaintiffs of its inclination to grant summary judgment in the absence of additional discovery and urge them to provide additional materials. Even in the absence of a properly supported request under Rule 56(f), a district court may, in the interest of justice, allow a party additional time to marshal what evidence he does have in opposition to a summary judgment motion. See 6 Moore's Federal Practice p 56.24. In these circumstances, however, we cannot conclude that the district court's procedure went beyond its allocated discretion.
 
 
 24
 B. Should the district court have reconsidered its summary
 
 
 25
 judgment order in light of subsequently produced evidence?
 
 
 26
 As noted, Plaintiffs were unable to persuade the district court to defer its summary judgment ruling pending discovery. A related issue is whether the district court should have considered summary judgment materials subsequently produced by the Plaintiffs in their postjudgment motion to reconsider. The district court declined to undertake such reconsideration.
 
 
 27
 We treat Plaintiffs motion to reconsider as a motion to alter or amend the judgment because the motion was filed within ten days after the district court's order granting summary judgment and dismissing the case was entered on the docket. See Foman v. Davis, 371 U.S. 178, 180-81, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962); Van Skiver v. United States, 952 F.2d 1241, 1243 (10th Cir.1991). The purpose for such a motion "is to correct manifest errors of law or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3rd Cir.1985), cert. denied, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). In these circumstances, we evaluate the district court's ruling on the Rule 59(e) motion for an abuse of discretion. Pasternak, 790 F.2d at 833.
 
 
 28
 When supplementing a Rule 59(e) motion with additional evidence, the movant must show either that the evidence is newly discovered [and] if the evidence was available at the time of the decision being challenged, that counsel made a diligent yet unsuccessful effort to discover the evidence.
 
 
 29
 Chery v. Bowman, 901 F.2d 1053, 1057-58 n. 6 (11th Cir.1990). See also Russ v. Int'l Paper Co., 943 F.2d 589, 593 (5th Cir.1991).
 
 
 30
 The district court evaluated the motion for reconsideration under a similar standard applied to a new trial motion based on newly discovered evidence. As we understand the district court's order, the proffered evidence did not warrant reconsideration because it had not been discovered subsequent to the order granting summary judgment, the Plaintiffs had not demonstrated reasonable diligence and the evidence would not produce a different result.
 
 
 31
 We recognize that the district court considered Plaintiffs' response in opposition to summary judgment without the later evidentiary attachments concerning alleged historical censorship. The two affidavits originally submitted in the response concern only the present film. Absent in this record, however, is an explanation of why Plaintiffs waited three months to submit additional evidence, and then as part of a Rule 59(e) motion. When one considers that Plaintiffs submitted largely historical evidence and that the affidavits submitted were not dated until March 25, 1990, it is evident that the Plaintiffs have not met their burden of showing diligence. They have not demonstrated that the evidence was newly discovered or unavailable in a more timely fashion through the exercise of diligence.[9] Plainly, the district court did not abuse its discretion in denying Plaintiff's motion for reconsideration.
 
 
 32
 II. Are Plaintiffs' equitable claims moot?
 
 
 33
 We next consider whether the district court abused its discretion insofar as it determined that plaintiffs' request for injunctive relief was moot, especially in light of the 1991 policy. The mootness inquiry goes "to the exercise rather than the existence of judicial power." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). A claim is moot when no reasonable expectation exists that the alleged violation will recur and interim relief of events have eliminated the effects of the alleged violation. County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).
 
 
 34
 The voluntary cessation of allegedly unlawful conduct does not necessarily make a case moot, unless defendants can establish no reasonable expectation of the wrong's recurrence. United States v. W.T. Grant Co., 345 U.S. at 632-33, 73 S.Ct. at 897. The latter is a heavy burden, and such a showing must be weighed against the possibility of recurrence and the public interest in having the case decided. Id. Even though the allegedly unlawful conduct has abated, the court may grant injunctive relief, "[b]ut the moving party must satisfy the court that relief is needed," that there is "some cognizable danger of recurrent violation." Id. at 633, 73 S.Ct. at 898.
 
 
 35
 Plaintiffs sought an injunction allowing the film to be shown and enjoining the defendants from future unconstitutional content-based discrimination and prior restraint of scheduled activities. I R. doc. 1 at 25. Concerning whether a request for injunctive relief is moot,
 
 
 36
 [t]he chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of past violations.
 
 
 37
 W.T. Grant Co., 345 U.S. at 633, 73 S.Ct. at 898. In this case, we have the Regents' expressed intent to comply, an effective discontinuance accompanied by a new policy and alleged past violations of a somewhat dissimilar nature, which the district court viewed as too remote.
 
 
 38
 An injunction concerning the showing of The Last Temptation of Christ plainly would be moot; the film was advertised and shown on the dates it was originally scheduled. Insofar as prospective injunctive relief, Plaintiffs subsequently urged the Defendants to adopt a new policy concerning prior restraint and content-based discrimination. The university administration then appointed a Freedom of Expression Committee which drafted a policy. While the formulation of the 1991 policy was in progress, Plaintiffs argued:
 
 
 39
 If OSU had in fact adopted a new policy that met constitutional standards, OSU might have met its "heavy" burden of proving that their was no reasonable likelihood of future unconstitutional content-based censorship. However, by OSU's own admission the policy revision is still in progress, and thus there is absolutely no assurance that the final policy as revised will meet the constitutional standards that Committee seeks to have enforced in this lawsuit.
 
 
 40
 Applts.' Reply Brief at 6-7 (footnote omitted). Thus, the Plaintiffs recognized that a new policy could alter this case.
 
 
 41
 Once the 1991 policy was adopted by the Regents, Defendants moved to dismiss this appeal. In response, Plaintiffs renewed their contention that the mootness inquiry required an evidentiary hearing on remand.[10] Plaintiffs suggest that an evidentiary hearing is needed to evaluate the wording of the new policy and whether the Regents will abandon or rescind the policy. A general review of the 1991 policy would be legal (and advisory), not factual, and no facts and circumstances requiring an evidentiary hearing have been brought to our attention.
 
 
 42
 Plaintiffs, who also have access to the 1991 policy, simply have not met their burden with respect to "some cognizable danger of recurrent violations." W.T. Grant, 345 U.S. at 632, 73 S.Ct. at 898. Even a cursory examination of the 1991 policy reflects major changes from the 1970 policy. It includes films within its coverage, contains an express disclaimer policy, provides for consultation with university legal counsel when proposed expression is thought to be unprotected by the First Amendment, and provides explicit procedures for when a content-based prior restraint issue arises, with the burden on the university administration to seek judicial review.
 
 
 43
 While we recognize that repeal of an objectionable portion of an ordinance, City of Mesquite, 455 U.S. at 283-84, 102 S.Ct. at 1070-72, or enactment of a new regulation which is not universal in coverage, United States v. Concentrated Phosphate Export Assn., 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968), or discontinuance of a challenged compensation plan which a party maintains is lawful, Walling v. Helmerich & Payne, 323 U.S. 37, 42-43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944), does not necessarily render a case moot, we also recognize that some reason must support Plaintiffs' insistence that the alleged violation is likely to recur. Defendants' burden concerning the unlikelihood of recurrence is a heavy one, but it by no means requires proof approaching metaphysical certitude. Moore v. Thieret, 862 F.2d 148, 150 (7th Cir.1988). Courts are not required to remand in futility, and the Regents' adoption of the new policy supports only the district court's initial decision. We decline to remand the case for an evidentiary hearing on whether Plaintiffs' request for injunctive relief is moot.
 
 
 44
 What Plaintiffs seek is an injunction framed no more narrowly than requiring the Defendants to follow the First Amendment concerning future on-campus activities of every sort. No specific facts anchor such a command rendering enforcement problematic in a university environment where hundreds of decisions concerning extracurricular use of facilities are made every academic year. When one considers the admissible and probative evidence,[11] it is apparent that Plaintiffs have come forth with such evidence concerning only the present film. As for similar occurrences at OSU, of particular note is Plaintiffs' testimony at the preliminary injunction hearing that the 1984 Jean-Luc Goddard film Je Vous Salve Marie [Hail Mary], a "very controversial film" was shown on campus (under the 1970 policy) two years in a row without a problem. II R. 66. In the absence of a genuine issue of material fact concerning mootness and Plaintiffs' injunctive relief claims, partial summary judgment was proper.
 
 
 45
 III. Are Plaintiffs' nominal damage claims moot?
 
 
 46
 Although we affirm the district court's summary judgment concerning mootness with respect to the injunctive relief, we must reverse the summary judgment insofar as the Plaintiffs' complaint for nominal damages. We reverse due to a legal error. Neither the showing of the film on the originally scheduled dates, nor the subsequent enactment of the 1991 policy erases the slate concerning the alleged First Amendment violations in connection with the film. Therefore, the district court erred in dismissing the nominal damages claim which relates to past (not future) conduct. If proven, a violation of First Amendment rights concerning freedom of expression entitles a plaintiff to at least nominal damages. See Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978) (procedural due process rights); Fyfe v. Curlee, 902 F.2d 401, 406 (5th Cir.) (First Amendment and familial privacy rights), cert. denied, --- U.S. ----, 111 S.Ct. 346, 112 L.Ed.2d 310 (1990); Familias Unidas v. Briscoe, 619 F.2d 391, 402 (5th Cir.1980) (First Amendment associational rights).
 
 
 47
 Defendants raised the affirmative defense of qualified immunity concerning the claim for nominal damages and sought summary judgment on the immunity issue. See Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Pueblo Neighborhood Health Ctr., Inc. v. Losavio, 847 F.2d 642 (10th Cir.1988). Because the district court granted summary judgment on all of Plaintiffs' claims for mootness, it did not resolve the qualified immunity issue. Although the parties have briefed the legal issue of qualified immunity on appeal, we decline to address the issue without the benefit of the district court's thoughts on the issue. On remand, the district court must first resolve Defendants' claim of qualified immunity.
 
 
 48
 AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 APPENDIX
 
 49
 Questions Submitted to the University President
 
 
 50
 The first four questions were forwarded to the University president on September 14, the next five on September 19, and the final question on September 20.
 
 
 51
 1. Exactly how is the Student Union Activities Board constituted with the authority to independently make a decision which might have a University-wide impact, with potential implications which might be of enormous significance to the general welfare of the University and which may be of extraordinary interest to the several constituencies of the University?
 
 
 52
 2. Is the Student Union Activities Board or other such organizations or entities endowed with the authority to simply announce to the news media a decision to act on any matter independent of how it might affect other University groups or organizations (i.e., Faculty Council or the faculty as a whole, the Student Government Association or the student population as a whole), the general welfare of the University, and regardless of how the administration and other decision makers may feel about a given issue that may have extensive consequences?
 
 
 53
 3. What is the process at Oklahoma State University on publicly announcing decisions by any group independent of those with overall responsibility for the University, particularly on matters which may have a University-wide impact affecting general public support, financial support, etc.?
 
 
 54
 4. On matters having University-wide implications, are there and should there be any constraints within which organizations such as the SUAB should operate?
 
 
 55
 5. Prior to the Student Union Activities Board announcing a decision to show this particular film, was sufficient consideration given to the question of whether showing this film could possibly represent an "entanglement" with certain Constitutional provisions related to religion (i.e. separation of Church/State standards)?
 
 
 56
 6. Would showing this particular film possibly compromise the University some time in the future on establishing itself in a position of "neutrality," on a related or similar issue by setting a precedent that later might prove unwanted?
 
 
 57
 7. As a matter of public policy, should careful consideration be given to developing a comprehensive policy related to "neutrality," particularly pertaining to matters of religious content, and should consideration be given to this question prior to deciding whether the film in question should be shown?
 
 
 58
 8. If the Student Union Activities Board or some other University-recognized entity decided to promote the showing of other films or sponsoring other activities (e.g., motivated by racial bigotry) considered to be highly offensive, defamatory, and, perhaps, inflammatory to a specific segment of the populace, have appropriate University officials considered how such a possibility would be managed? Does such a hypothetical circumstance give further merit to questioning the wisdom of showing the film in question?
 
 
 59
 9. Would the showing of the film, "The Last Temptation of Christ" or some similar activity indicate the possibility of such extensive damage to the University that unusual caution is warranted for this reason in addition to any other reason that might be examined in deciding whether such a film should be shown under the sponsorship of the University or under the sponsorship of any group or organization recognized by or connected to the University or in deciding whether the film should be shown on the University campus under any condition? Is it reasonably expected that the showing of the film will highly offend a major segment of the Oklahoma citizenry (i.e. the Christian community) and if so, how does the expectation weigh on the final decision?
 
 
 60
 10. Would denial or prohibition of showing the film in question impinge on certain rights guaranteed under the U.S. Constitution (this question should be weighed in consideration of the question pertaining to a possible "entanglement" turning on other certain Constitutional provisions related to the separation of Church/State standards, and in ascertaining if there is a legitimate interest of "neutrality" which should be protected by prohibiting the showing of the film)?
 
 
 61
 I R. doc. 6 ex. E; Applee. App. at 3-7.
 
 
 
 *
 The Honorable Edward Dumbauld, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 In this 42 U.S.C. § 1983 action, all defendants have been named in their official capacities; all but two defendants (Beer and Keys) also appear to have been named in their individual capacities. A damage award against the defendants in their official capacities is barred by the Eleventh Amendment. See Will v. Michigan, 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989); Kentucky v. Graham, 473 U.S. 159, 169-70, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985); Seibert v. Univ. of Okla. Health Sciences Ctr., 867 F.2d 591, 594-95 (10th Cir.1989); Kroll v. Board of Trustees, 934 F.2d 904, 906-09 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 377, 116 L.Ed.2d 329 (1991). Claims for injunctive relief against the defendants in their official capacities may be maintained despite the Eleventh Amendment "because 'official-capacity actions for prospective relief are not treated as actions against the State.' " Will, 491 U.S. at 71 n. 10, 109 S.Ct. at 2311 n. 10 (quoting Kentucky v. Graham, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14); Kashani v. Purdue Univ., 813 F.2d 843, 848 (7th Cir.), cert. denied, 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987). Claims for injunctive relief and damages against defendants in their personal capacities may proceed under § 1983; such claims are not barred by the Eleventh Amendment. See generally Hafer v. Melo, --- U.S. ----, 112 S.Ct. 358, 361-62, 116 L.Ed.2d 301 (1991) (distinguishing between defenses available in official capacity and personal capacity actions); Graham, 473 U.S. at 165-68, 105 S.Ct. at 3104-06 (same)
 
 
 [2]
 This Martin Scorsese film is based on the book of the same name, see Nikos Kazantzakis, The Last Temptation of Christ (1960). Jesus is portrayed as a carpenter who after crucifixion descends from the cross. Jesus marries Mary Magdalene, who dies in childbirth, and later he marries her sister Martha. Jesus fathers children and at the end of his natural life returns to the torment of the cross. The film has not been without controversy. See, e.g., Nayak v. MCA, 911 F.2d 1082 (5th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991)
 
 
 [3]
 Reproduced as an appendix
 
 
 [4]
 See Thomas J. Altizer & William Hamilton, Radical Theology and the Death of God (1966)
 
 
 [5]
 The district court viewed Defendants' motion for summary judgment on the grounds of mootness as the functional equivalent of a motion to dismiss for failure to state a claim. See Fed.R.Civ.P. 12(b)(6); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 444 (3rd Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). This characterization is incorrect because the district court apparently considered material outside the complaint and the amended complaint in deciding the mootness question. See 6 James W. Moore, Walter J. Taggart & Jeremy C. Wicker, Moore's Federal Practice § 56.02 (1992). For example, the district court necessarily relied on Defendants' evidence supporting the material fact that the film was shown as originally scheduled, see I R. doc. 16 at 11 (Defendants' Fact No. 35). Moreover, the district court heard the preliminary injunction testimony. The district court's dismissal must be evaluated as an order granting summary judgment. Carter v. Stanton, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (per curiam); M.S. News Co. v. Casado, 721 F.2d 1281, 1285 n. 3 (10th Cir.1983); Harper Plastics, Inc. v. Amoco Chemicals Corp., 617 F.2d 468, 469 n. 2 (7th Cir.1980)
 
 
 [6]
 Fed.R.Civ.P. 56(f) provides:
 When affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
 
 
 [7]
 When a party seeking damages from a government official files a Rule 56(f) affidavit in response to a qualified immunity defense, that party must demonstrate how discovery will enable him to rebut a defendant's showing of objective reasonableness. Jones v. City & County of Denver, 854 F.2d 1206, 1211 (10th Cir.1988). Merely stating that more discovery is needed or that affidavits by unnamed parties "will establish a long history of censorship" is no more availing than unspecific references to yet-to-be discovered evidence of discriminatory animus. See Lewis v. City of Ft. Collins, 903 F.2d 752, 758-59 (10th Cir.1990)
 
 
 [8]
 Plaintiffs did not contest the Defendants' "Statement of Material Facts as to Which There is No Genuine Issue." See I R. doc. 23 at 2
 
 
 [9]
 In this case, we need not speculate as to the worth of the additional affidavits which were submitted on the heels of the district court's grant of summary judgment. The affidavits are by retired OSU professors and address alleged censorship no more recent that 1970. The affidavits contain a good bit of hearsay and information which does not appear to be within the personal knowledge of the affiants. None of the events concerns operation of OSU under the 1970 speaker policy. The district court discounted this evidence as too remote. See note 11 infra
 
 
 [10]
 Plaintiffs rely on Johnson v. New York State Educ. Dep't, 409 U.S. 75, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972) (per curiam) and Chinese for Affirmative Action v. Leguennec, 580 F.2d 1006 (9th Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), in which appellate courts have remanded for an initial mootness determination. In contrast, this case primarily involves appellate review of a district court's determination that a case has become moot. To the extent that a new development has augmented the district court's finding of mootness, the Plaintiffs have not apprised us of any specific and unresolved factual issues which would require a hearing
 
 
 [11]
 As noted, the district judge discounted the Plaintiffs' documentary evidence and affidavits pertaining to events prior to 1971 as "remote in time and involv[ing] individuals other than those who presently sit on the Oklahoma State University Board of Regents and who presently hold positions within the OSU administration." A change in university personnel does not preclude evidence tending to show that an unconstitutional custom or policy remains. However, Plaintiffs' evidence concerns a variety of grievances concerning the Regents, their executive secretary, academic freedom and freedom of expression. It also concerns events under a 1968 speaker policy which resulted in a settlement in Bullock v. Kamm. The district court's determination that the evidence was too remote was not an abuse of discretion. See generally II James H. Chadbourn, Wigmore on Evidence §§ 376 (discussing habit of conduct evidenced by specific instances) & 437 (discussing prior existence of a condition as indicative of current existence) (1979). Plainly, the district court could conclude that intervening events (a 1970 speaker policy and over eighteen years of quiescence) had changed the landscape such that the prior events (which did not involve films) were collateral and of doubtful relevance to the present controversy. See McWhorter v. City of Birmingham, 906 F.2d 674, 679 (11th Cir.1990) (in § 1983 action for discharge in retaliation for First Amendment rights, district court did not abuse discretion under Fed.R.Evid. 404(b) or 406 in excluding testimony of other officers who allegedly were harassed)
 In opposing a motion for summary judgment, the nonmovant must make a showing that, "if reduced to admissible evidence," would be sufficient to carry the nonmovant's burden of proof at trial. Celotex, 477 U.S. at 327, 106 S.Ct. at 2555. We agree with the Defendants that any cause of action based on these historic facts probably would be time-barred, and admission of these alleged facts would necessitate a series of mini-trials concerning collateral issues occurring from 1966-70. Even assuming that all of the incidents in question could be reduced to admissible evidence, such dated material simply is not "significantly probative," Anderson, 477 U.S. at 249, 106 S.Ct. at 2510, of a custom or policy of censorship existing to the present day. We find this to be true notwithstanding that Plaintiffs' proof might be somewhat less direct given the First Amendment interests involved, and the serious allegations of direct content-based infringement, see Healy v. James, 408 U.S. 169, 180-81, 92 S.Ct. 2338, 2345-46, 33 L.Ed.2d 266 (1972); Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) (plurality opinion), and prior restraints. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558-562, 95 S.Ct. 1239, 1246-48, 43 L.Ed.2d 448 (1975). Thus, the Plaintiffs have not met their summary judgment burden. See Id. (summary judgment evidence must be beyond colorable; it must be significantly probative); Cities Serv., 391 U.S. at 290, 88 S.Ct. at 1593.
 Plaintiffs imply that an alleged de jure system of censorship which resulted in prior remedial action is automatically relevant, no matter how dated. They have cited no presumption in the First Amendment area (unlike school desegregation cases, see, e.g., Keyes v. School Dist., 413 U.S. 189, 200-01, 93 S.Ct. 2686, 2693-94, 37 L.Ed.2d 548 (1973); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971)), which would enable them as a matter of law to relate a current restriction on speech to a restriction over twenty years ago.