44 F.3d 847
 97 Ed. Law Rep. 60
 Richard L. CUMMINS, Plaintiff-Appellant,
v.
John R. CAMPBELL, individually and in his official capacity
as President of Oklahoma State University; H. Jerrell
Chesney, individually and in his official capacity as
Executive Secretary of the Board of Regents for the Oklahoma
Agricultural and Mechanical Colleges; Carolyn Savage, L.E.
Stringer, Jack Craig, Austin Kenyon, Bill Braum, John W.
Montgomery, Jimmie Thomas, Robert D. Robbins, Ed Malzahn,
individually and as members of the Board of Regents for the
Oklahoma Agricultural and Mechanical Colleges; Ronald Beer,
as Vice-President of Student Services of Oklahoma
University; Tom Keys, as director of the Student Union,
Defendants-Appellees.
 No. 92-5180.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 28, 1994.
 
 Laura Emily Frossard, Tulsa, OK (Michael Salem, Norman, OK, with her on the brief), for plaintiff/appellant.
 Burck Bailey, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, OK (Barbara G. Bowersox, with him on the brief), for defendants/appellees.
 Before BALDOCK, BARRETT, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This case is before us for the second time. This dispute initially arose after the Oklahoma State University Board of Regents ("Regents") temporarily suspended the prospective showing of the film The Last Temptation of Christ until they could receive answers to legal questions they had submitted to the Oklahoma State University ("OSU") President. The Regents in a special meeting lifted the suspension on October 13, 1989, in time for the showings on October 19-21 to take place as initially scheduled.
 
 
 2
 The first time this case was before us, we remanded it for the district court to decide whether Appellants[1] were entitled to nominal damages and whether the Regents enjoyed qualified immunity. Committee for the First Amendment v. Campbell, 962 F.2d 1517, 1526-27 (10th Cir.1992) [hereinafter "Committee "]. On remand, the district court determined that Appellant was not entitled to nominal damages from the members of the Board of Regents because they enjoyed qualified immunity. The district court also ruled that, although petitioners were entitled to attorney's fees for work performed up to the showing of the movie, they were not entitled to attorney's fees for work performed after October 18, 1989.
 
 
 3
 Appellant has appealed those rulings. We hold that the Regents were entitled to qualified immunity because the constitutional law they allegedly violated was not clearly established at the time they briefly suspended authority to show the film. We also hold that denial of attorney's fees for work done after the suspension was lifted was not an abuse of discretion because Appellant is not the prevailing party with regard to work done after the suspension was lifted.
 
 
 4
 Accordingly, we AFFIRM.
 
 BACKGROUND
 
 5
 The OSU Student Union Activities Board (SUAB) scheduled the film, The Last Temptation of Christ, to be shown October 19 through 21, 1989. The film was described as controversial:
 
 
 6
 This Martin Scorsese film is based on the book of the same name.... Jesus is portrayed as a carpenter who after crucifixion descends from the cross. Jesus marries Mary Magdalene, who dies in childbirth, and later he marries her sister Martha. Jesus fathers children and at the end of his natural life returns to the torment of the cross. The film has not been without controversy. See, e.g., Nayak v. MCA, 911 F.2d 1082 (5th Cir.1990), [cert. denied, 498 U.S. 1087, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991) ].
 
 
 7
 Committee, 962 F.2d at 1519 n. 2. Immediately after the film, two non-student religious organizations were scheduled to cosponsor a panel discussion off OSU grounds. The advertisement for the movie represented that it was "presented by SUAB" and that immediately following the movie there would be a discussion by two religious groups at the United Methodist Student Center.
 
 
 8
 At the September 22, 1989 Regents' meeting, the Regents deferred their decision as to whether the movie could be shown in this context until they could receive advice from OSU's President and legal counsel. The Regents questioned whether the film should be shown because, in part, of concerns about excessive entanglement between a state university and religion, as highlighted by the religious overtones and implications of sponsorship in this advertisement. More specifically, the Regents' concern about entanglement stemmed from the fact that SUAB was an agent of OSU because OSU sponsored SUAB through OSU funds, personnel, and office and theatre use. The Regents were concerned that it would appear that OSU, through SUAB, was sponsoring the film. The record shows that SUAB received student fees from the OSU coffers, and that OSU employed personnel to oversee the student union, such as Defendant-Appellee Tom Keys, director of the student union. Additionally, it is undisputed that the theatre at which the movie was to be shown was OSU property.
 
 
 9
 To investigate its concerns, the Regents' Chief Executive Secretary sent ten questions to the OSU President. See Committee, 962 F.2d at 1519, app. at 1527-28. The Regents knew about these questions and suspended approval for the film's showing until they received answers.
 
 
 10
 In early October, before the Regents made a final decision as to whether the film could be shown, the original Plaintiffs filed suit in federal district court seeking a preliminary injunction allowing them to show the film. The district court denied Plaintiffs' requested preliminary injunction and deferred ruling on the merits until after the Regents held a special meeting to decide whether to allow the film to be shown. The district court "strongly intimated that judicial resolution of the issue would not favor Regents' suspension decision." Id. at 1519. On October 13th, the Regents voted to lift the suspension and the movie was shown as scheduled.
 
 
 11
 Plaintiffs thereafter filed an amended complaint demanding nominal damages from the Regents in their individual capacities[2] for having violated the Plaintiffs' First Amendment rights. On remand from this court, the district court, on summary judgment, denied Plaintiffs' nominal damages claim because it found that the Regents enjoyed qualified immunity. Appellants appeal that decision and the district court's order denying additional attorney's fees.
 
 DISCUSSION
 I. QUALIFIED IMMUNITY
 
 12
 We review the grant of summary judgment de novo, applying the same legal standard as the district court. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). Special rules apply when a defendant raises the defense of qualified immunity in a summary judgment motion. Hinton v. City of Elwood, Kan., 997 F.2d 774, 779 (10th Cir.1993). In such a case, the plaintiff must initially make a twofold showing. Id. First, the plaintiff must show that the defendant's alleged conduct violated the law. Id. Second, the plaintiff must show " 'that the law was clearly established when the alleged violation occurred.' " Id. (quoting Pueblo Neighborhood Health Ctrs. v. Losavio, 847 F.2d 642, 646 (10th Cir.1988)).
 
 
 13
 If the plaintiff makes this twofold showing, the defendant then bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. Id. More specifically, the defendant must show that there are no material factual disputes as to whether his or her actions were " 'objectively reasonable in light of the law and the information he or she possessed at the time.' " Id. (quoting Coen v. Runner, 854 F.2d 374, 377 (10th Cir.1988) (citation omitted)). In determining whether both parties have satisfied their respective burdens, we evaluate the evidence in the light most favorable to the nonmoving party. Id.
 
 
 14
 In Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court rejected a subjective test for this qualified immunity analysis. The Harlow Court explained:
 
 
 15
 Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.
 
 
 16
 Id. at 818-19, 102 S.Ct. at 2738 (footnotes omitted). We have adopted the Harlow Court's objective standard for those cases in which the subjective motive of the governmental official is not an element of the claim. Pueblo, 847 F.2d at 647-48.
 
 
 17
 Thus, to prevail in this action, Appellant must show that Appellee's suspension of the showing of the film violated clearly established law in effect on September 22, 1989. Appellant attempted to meet this burden by asserting that the Appellees violated his clearly established First Amendment rights as unambiguously articulated in Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), when they engaged in content-based censorship and prior restraint of the film. However, the district court agreed with Appellees that the law Appellees allegedly violated was not clearly established and granted them summary judgment based on qualified immunity.
 
 A. Content-Based Censorship
 
 18
 The Regents argue that they simply wanted to make sure that they were not "establishing" or "endorsing" religion when they temporarily suspended their approval for showing the film on September 22. The district court found for the Appellees on this ground, stating that "when the Defendants [Appellees] sought timely pertinent advice of legal counsel concerning the potential First Amendment conflicts herein they did not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Order of Aug. 7, 1992, at 10 (quoting Harlow, 457 U.S. at 818, 102 S.Ct. at 2738). The district court said that "[a]chieving neutrality while at the same time balancing the tension created by the free speech and establishment tenets of the First Amendment calls for considered judgment which does not lend itself to hasty decision. Timely but purposeful reflection is prudent." Id. at 9.
 
 
 19
 Appellant directs our attention to Widmar as evidence that the law that the Regents allegedly violated was clearly established. In Widmar, a religiously-oriented student group was told that it could not hold its meetings on university property, even though that property was generally available for meetings of other student groups, because the university did not want to run afoul of the Establishment Clause of the First Amendment. The Supreme Court held that the university was in error in excluding the religious group from the use of its meeting rooms. The Supreme Court applied the three-part Lemon test[3] in reaching its conclusion that the Establishment Clause does not preclude a state institution from making its facilities available to private religious groups so long as those facilities were made available to other groups as well, the religious groups did not predominate, and the university did not sponsor or endorse the religious activity. Widmar, 454 U.S. at 270-77, 102 S.Ct. at 274-78. The Court stated that the mere act of providing "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices." Id. at 274, 102 S.Ct. at 276.
 
 
 20
 However, the Supreme Court went on to set some limits to its holding. It distinguished a prior case where "the school may appear to sponsor the views of the speaker." Widmar, 454 U.S. at 272 n. 10, 102 S.Ct. at 276 n. 10. It went on to stress that:
 
 
 21
 In light of the large number of groups meeting on campus, however, we doubt students could draw any reasonable inference of University support from the mere fact of a campus meeting place. The University's student handbook already notes that the University's name will not "be identified in any way with the aims, policies, programs, products, or opinions of any organization or its members."
 
 
 22
 Id. at 274 n. 14, 102 S.Ct. at 276 n. 14 (quoting student handbook); see also Lamb's Chapel v. Center Moriches Union Free Sch. Dist., --- U.S. ----, ----, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (applying Widmar to a situation where the showing of a film on school grounds similarly "would not have been sponsored by the school"). It is in this area of presenting an appearance of sponsorship that the facts of this case begin to diverge from Widmar.
 
 
 23
 Here, there is evidence that SUAB is not simply a student group totally independent of the university as was the case in Widmar. Widmar left open the possibility that a university's sponsorship of a religious activity may be viewed as excessive entanglement. Widmar, 454 U.S. at 272 n. 12, 274, 102 S.Ct. at 276 n. 12, 276-77. Here, Appellant has not disputed that Tom Keys, the director of the Student Union, is an OSU employee, that SUAB receives student fees from OSU's student fee coffers, or that SUAB scheduled the film and the SUAB name was on the literature advertising the film. These facts, rather than the mere fact that the film was shown on OSU property, distinguishes Widmar. Thus, there is at least an appearance, and perhaps a reality, that SUAB is an agent of or an extension of OSU itself.
 
 
 24
 Appellant's complaint contains the following uncontested assertions:
 
 
 25
 3. ... The Student Union is managed by Defendant TOM KEYS, its Director, and is a part of the overall operation of the University under RON BEER, Vice-President for Student Services, who reports to JOHN CAMPBELL, President of Oklahoma State University.
 
 
 26
 4. The Student Union Activities Board is generally responsible for the ultimate selection of selected programs and on occasion consults with Defendant KEYS. Defendant KEYS generally limits his consultation with the members of the SUAB Board to scheduling and financial consideration ... and occasionally mak[es] suggestions about films to be shown.
 
 
 27
 5. ... The operating expenses of the theatre are paid by admission fees, University funds in the form of student activity fees and donations.
 
 
 28
 Although Appellant presents paragraph 4 as evidence of independence, we think it instead suggests that OSU has not given up control over the programming at its theatre.
 
 
 29
 The record intimates enough connection between SUAB and OSU that SUAB's actions may be seen to be sponsored by or a part of OSU itself. On that basis, we find that Widmar does not clearly establish the law for this case. The Regents' decision whether to allow the film to be shown may be viewed as nothing more than OSU deciding whether it wanted to speak or to sponsor specific speech. We conclude that the law was not clearly established at the time the Regents acted such that a reasonable official would understand that his or her actions in this case would violate Appellant's rights. Accordingly, we affirm the district court's grant of summary judgment based on qualified immunity as to all Appellees on this issue.
 
 B. Prior Restraint
 
 30
 Appellant also asserts that OSU violated clearly established law with respect to its suspension of approval to show the film because the suspension amounted to a prior restraint of protected speech. Appellant relies on the Supreme Court's decision in Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). In Southeastern, the Court affirmed its prior-restraint three-part procedural safeguard test first articulated in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).
 
 
 31
 [A] system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured.
 
 
 32
 Southeastern, 420 U.S. at 560, 95 S.Ct. at 1247.
 
 
 33
 A prior restraint "arises where the content of the expression is subject to censorship. Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated." O'Connor v. City and County of Denver, 894 F.2d 1210, 1220 (10th Cir.1990) (citations omitted). Thus, to overcome the Regents' qualified immunity with respect to a prior restraint violation, Appellant must show that the law is clear that the Regents' actions amounted to a procedurally deficient prior restraint.
 
 
 34
 Appellant has failed to meet this burden because he has not shown that a prior restraint has occurred. To the extent that SUAB is an agent of or extension of OSU itself, the Regents have not restrained anyone's speech or sponsorship of anyone's speech but its own. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 270-73, 273 n. 7, 108 S.Ct. 562, 569-71, 571 n. 7, 98 L.Ed.2d 592 (1988) (upholding a high-school principal's decision to excise two pages from the school sponsored newspaper and reserving for a future case whether the court would grant the same deference "with respect to school-sponsored expressive activities at the college and university level");[4] see also Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2148 (implying that whether a school could exclude religious speech from a public forum depended at least in part on whether there was any realistic danger that the community would think that the District was endorsing religion or sponsoring the religious activity). Here, as pointed out above, there is indicia of OSU's sponsorship of the proposed speech. Thus, for purposes of our prior restraint analysis, it is not clear that the Regents violated clearly established law or engaged in a prior restraint of another entity's speech.
 
 
 35
 We additionally note that, although approval for the film was suspended pending the Regents' review of legal advice, the film was ultimately shown on the originally scheduled dates. Cf. Southeastern, 420 U.S. at 562, 95 S.Ct. at 1248 (listing the fact that "Petitioner was forced to forego the initial dates planned for the engagement and to seek to schedule the performance at a later date" as one of the "procedural shortcomings" making the prior restraint "run afoul" of the First Amendment). There was no indication that the Regents' actions were designed to inhibit adequate publication of the event or that their actions in any way lessened the film's attendance.[5]
 
 
 36
 We conclude that the law was not clearly established at the time the Regents acted, such that a reasonable official would understand that his or her actions would violate Appellant's rights. Accordingly, we affirm the district court's grant of summary judgment based on qualified immunity as to all Appellees on this issue.
 
 II. ATTORNEY'S FEES
 
 37
 Plaintiffs were granted attorney's fees for the work their attorneys performed through October 18, 1989, the day before the film was actually shown, which amounted to approximately $18,000 of the $46,850 that was requested. Appellant appeals the district court's denial of the approximately $28,000 in fees that were for work performed after the film was shown.
 
 
 38
 We review the award of attorney's fees under an abuse of discretion standard. Goichman v. City of Aspen, 859 F.2d 1466, 1471 (10th Cir.1988). "Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." United States v. Ortiz, 804 F.2d 1161, 1164 n. 2 (10th Cir.1986). Moreover, when determining an attorney's fee award based on success rate, "[t]he district court's assessment of the degree of success is entitled to great weight." Hernandez v. George, 793 F.2d 264, 268 (10th Cir.1986).
 
 
 39
 Here, the district court found that Plaintiffs were prevailing parties as to some of the relief requested. Although the district court did not rule that the Regents' prior restraint of the film violated the Plaintiffs' constitutional rights, and the court denied the injunctive relief sought, the court did find that Plaintiffs were
 
 
 40
 entitled to an award of attorneys fees as prevailing parties on at least some of the relief sought and success gained in this matter. While dispute existed whether OSU Regents had or had not yet scheduled a meeting to make a final decision as to the showing or non-showing of "The Last Temptation of Christ", the filing of this lawsuit on October 5, 1989, and the Court hearing on October 12, 1989, served as a salutary catalyst in the Regents [sic] decision to allow the showing of the controversial film on the scheduled dates. However, to continue the litigation beyond the showing of the subject film on the scheduled dates was to continue, in essence, a moot controversy.
 
 
 41
 Order of July 31, 1991. Accordingly, the district court awarded Plaintiffs all of their fees through the day before the showing of the film. The district court denied all fees for work after that time because it determined that Plaintiffs had already achieved the main purpose of initiating the suit. The district court's approach is consistent with the balancing test we have used in this circuit when evaluating the amount of attorney's fees that should be awarded. See, e.g., Hernandez, 793 F.2d at 268 (upholding the district court's determinations of success rate and resultant attorney's fees); see also Farrar v. Hobby, --- U.S. ----, ---- - ----, 113 S.Ct. 566, 574-75, 121 L.Ed.2d 494 (1992) (instructing district courts to compare what the plaintiff actually achieved with the total relief sought in determining "the degree of success" for setting attorney's fees).
 
 
 42
 Appellant argues that he continued to work on the case and that it was ongoing, at least until the district court ruled on his amended complaint. However, as the district court aptly noted, the initial purpose of the suit was to lift the suspension of the film's showing. Appellant "prevailed" on that issue. Appellant then continued to litigate in an attempt to obtain a permanent injunction and nominal damages. While both of these remedies are related to the initial purpose of the litigation, Appellant has thus far lost with respect to these issues in both the district court and in our court today. The lifting of the ban and the subsequent litigation are not so intertwined that both must be pursued.
 
 
 43
 Appellant also argues that more than partial or limited success was achieved for the overall litigation; however, Appellant ignores his losses at every level of litigation. If Appellant lumps the post-October 18, 1989 litigation in with the pre-October 18, 1989 litigation, then Appellant can be said to have achieved only limited success--solely as a catalyst for the suspension being lifted. The district court has discretion to set a reasonable fee, and in our opinion did so. If Appellant instead argues that the pre-October 18 litigation was a complete success, Appellant must also acknowledge that all post-October 18 litigation has been a complete loss. Thus, no fees should be allowed for post-October 18 litigation. We cannot conclude that the court abused its discretion.
 
 
 44
 Appellant also claims fees for his counsel's assistance in preparing OSU's new extracurricular policy with regard to free speech. However, OSU's new speech policy was not one of the issues litigated. The district court did not abuse its discretion in denying fees for this service.
 
 
 45
 Finally, Appellant argues that he should be awarded fees for preparing the attorney's fees application. The Tenth Circuit generally allows recovery of fees for an attorney's work in seeking attorney's fees. "Compensating attorneys for work in resolving the fee issue furthers the purpose behind the fee authorization in Sec. 1988 which is to encourage attorneys to represent indigent clients and to act as private attorneys general in vindicating federal civil rights policies." Hernandez, 793 F.2d at 269; see also, Glass v. Pfeffer, 849 F.2d 1261, 1266 n. 3 (10th Cir.1988). However, the award of fees for the preparation of the fee application is not without limits. In Glass we said that " '[i]t is obviously fair to grant a fee for time spent litigating the fee issue, at least if the fee petitioner is successful and his claim as to a reasonable fee is vindicated, since it is the adversary who made the additional work necessary.' " Id. (emphasis added) (quoting Prandini v. National Tea Co., 585 F.2d 47, 54 n. 8 (3d Cir.1978)).
 
 
 46
 While both Glass and Hernandez support Appellant's argument that time spent on the initial fee settlement is generally allowed, both cases also support the district court's discretionary decision to deny an award for those hours if the Appellant's underlying claim for fees was unreasonable. Appellant requested $46,850 in fees, most of which was for work done after the film was shown and for which Appellant was not the prevailing party. Had Appellant's initial fee request been more reasonable, fee litigation might have been avoided. Moreover, Appellant received the full amount of requested fees for the pre-film showing legal work despite having achieved only partial success for the pre-film work and no success for post-film work. Therefore, we conclude that the fee the district court allowed was not an abuse of discretion.
 
 CONCLUSION
 
 47
 Accordingly, we AFFIRM.
 
 
 
 [1]
 Only one of the original Plaintiffs, Mr. Richard L. Cummins, appealed the district court's remand decision. We refer to Mr. Cummins as Appellant. References to Plaintiffs or Appellants are to the original Plaintiffs and the Appellants in Committee for the First Amendment v. Campbell, 962 F.2d 1517 (10th Cir.1992) [hereinafter "Committee"]. The original Plaintiffs consisted of the Committee for the First Amendment, an unincorporated association of students, faculty, and other members of the university community of Oklahoma State University. Appellant-Cummins was a member of the Committee for the First Amendment and a member of the faculty. See Committee, for the list of Committee for the First Amendment members
 
 
 [2]
 The district court correctly held that damages against defendants in their official capacities were barred because officials acting in their official capacities are not "persons" under 42 U.S.C. Sec. 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989)
 
 
 [3]
 "First, the [governmental policy] must have a secular legislative purpose; second, its principle or primary effect must be one that neither advances nor inhibits religion ...; finally, the [policy] must not foster 'an excessive government entanglement with religion.' "
 Widmar, 454 U.S. at 263, 102 S.Ct. at 271 (quoting Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)).
 
 
 [4]
 Cf. Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (producing no majority opinion on the merits and remanding for a trial to determine whether there was a free speech violation). In Pico, the Justices were split over whether the school board's removal of books present in the school's library raised free speech issues distinct from a school's initial choice not to purchase those same books. Here, although SUAB had already rented the film, there is no indication that OSU had ever agreed to the rental nor had the film already been placed "on the library shelf."
 
 
 [5]
 OSU did require SUAB to remedy the ambiguous sponsorship issue on the advertisements for the film and include a disclaimer that "[t]he showing of this film does not reflect an endorsement of its contents by the OSU Board of Regents or Oklahoma State University." Committee, 962 F.2d at 1520. We do not consider this disclaimer, in the face of OSU's concern that the OSU community would attribute the film's showing and subsequent panel discussions to be OSU sponsored, to be constitutionally suspect in any manner