**MITCHELL COACH MANUFACTURING COMPANY, INC., a Florida corporation, Plaintiff,**

v.

**Ronny STEPHENS, an individual, and Texstar National Bank, a national banking association, Defendants.**

**No. 97–CV–429–B(J).**

United States District Court, N.D. Oklahoma.

June 2, 1998.

James William Tilly, Craig Alan Fitzgerald, Tilly & Associates, Tulsa, OK, for plaintiff.

J. Kevin Blaney, Jones & Blaney, Oklahoma City, OK, Jack M. Partain, Jr., Michael M. Parker, Fulbright & Jaworski, San Antonio, TX, for defendants.

*ORDER*

BRETT, District Judge.

The Court has for decision the motions for summary judgment, pursuant to Fed. R.Civ.P. 56, filed by the Plaintiff, Mitchell Coach Manufacturing Company, Inc., ("Mitchell") (Docket No. 31), and by the Defendants, Ronny Stephens ("Stephens") and TexStar National Bank ("TexStar") (Docket No. 36).[1] After a comprehensive review of the record and applicable legal authority, the Court concludes the partial motion for summary judgment of the Defendants (Docket No. 36) should be sustained. Plaintiff's motion for summary judgment (Docket No. 31) is hereby overruled.

1. Pursuant to the Court's request, the parties filed supplemental briefs addressing the effect, if any, of the following statutes on 12A O.S. § 2–401 and § 9–305, as well as on the issues of ownership and perfection and priority of the security interests in the motor home in this case:

*Undisputed Facts*

1. Mitchell, with its principal place of business in Pryor, Oklahoma, manufactures motor homes under the brand name "Vogue." Mitchell sells the motor homes which it manufactures to retail dealers, who in turn sell the motor homes to their customers. Mitchell also sells directly to customers through a sister corporation, Mitchell Motor Coach Sales, Inc. (Deposition. of Peggy Fedgetter, pp. 11, 15–17; Deposition. of Harvey Mitchell, pp. 20–21, 39–40).

2. On July 5, 1996, Mitchell entered into a Retail Dealer Sales and Service Agreement ("Dealer Agreement") with an entity known as WW, Inc. ("WW"). WW is a trade name for W & W Starter and Alternator, Inc., a Texas corporation in the automotive business, which also does business under the name WW RV. WW's place of business is in Seguin, Texas, and serves as dealer for other motor home manufacturers than Mitchell. Harry Womack ("Womack") is the owner of WW. Paragraph 6 of the Dealer Agreement states WW is an independent contractor and not the agent of Mitchell. Stephens was neither a party to nor aware of the Dealer Agreement between WW and Mitchell. (Retail Dealer Sales and Service Agreement, Plf's Ex. C attached to Brief in Support of Motion for Summary Judgment (hereinafter, "PE"); Deposition of Harry Womack, pp. 4–5, 92–93; Deposition of Ronny Stephens, pp. 9–12).

3. WW, as Mitchell's exclusive Vogue dealer in Texas, purchased motor homes from Mitchell and resold the motor homes to WW's customers. Generally, WW would purchase motor homes from Mitchell for resale in one of two ways. Under the first method, WW would order a motor home to be manufactured in the future and would pay a deposit for these motor homes to Mitchell. The amount of deposit varied, depending on the type of motor home to be manufactured. Under the second method, used when the motor home was already completed, WW

47 O.S.1985 § 1101 *et seq.* (as amended) (particularly, §§ 1102, 1103, 1105, 1110); 12A O.S. §§ 1–105 and 9–1.03.1(2) (as amended). The Court also hereby grants the parties' motions to supplement their motions for summary judgment. (Docket Nos. 66 and 79).

would simply purchase the motor home from Mitchell without paying a deposit. (Deposition of Harry Womack, pp. 25–26, 31, 34).

4. Sometime in the Summer of 1996, Stephens approached WW's sales representatives about purchasing a new motor home. Through his contact with WW, Stephens became interested in purchasing a Vogue motor home. (Depo. of Ronny Stephens, pp. 9–12).

5. On or about September 28, 1997, Stephens accompanied Womack and other WW sales people to Mitchell's factory to assist Stephens in deciding whether to purchase a new Vogue motor home. While at Mitchell's factory, various Mitchell employees also discussed the virtues of the Vogue motor home with Stephens. (Depo. of Harry Womack, pp. 44–45; Depo. of Ronny Stephens, pp. 13–15).

6. While at the Mitchell factory in Oklahoma, Stephens decided to purchase a new Vogue motor home and met with Peggy Fedgetter, a Mitchell salesperson, to determine which customized options he wanted. Stephens entered into a Retail Buyer's Order with WW on September 28, 1997 to purchase the motor home. Mitchell was not a party to the Retail Buyer's Order nor did it receive a copy thereof. Stephens paid WW a deposit of $20,000.00, as partial payment of the agreed upon Vogue sale price of $289,323.85. Stephens and WW also agreed that Stephens would trade in two vehicles, a Suzuki Samurai and a 1994 Sea Breeze motor home. The Retail Buyer's Order signed by WW and Stephens contained, *inter alia*, the following provisions: "No contractual relationship is created hereby" and "Title to said equipment shall remain with the seller (WW) until the agreed purchase price thereof is paid in full, in cash; thereupon, title to the within described unit passes to the buyer (Stephens) as of the date of payment, even though the actual physical delivery may not be made until a later date." (Depo. of Harvey Mitchell, pp. 13, 17–18; Depo. of Harry Womack, pp. 45, 48, 107, 109, 153, 155; Depo. of Ronny Stephens, p. 18; Retail Buyer's Order, Plf.'s Ex. H to Brief filed 11–26–97).

7. WW paid Mitchell a deposit of $10,000 toward Stephens' purchase of the Vogue motor home identified as M277 (hereinafter, the "motor home") in the Retail Buyer's Order. (Retail Buyer's Order, PE H; Depo. of Harry Womack, pp. 47, 110, 195).

8. The motor home was to be delivered sometime after the first of the year. Stephens specified and it was agreed that he would personally pick the motor home up at Mitchell's · factory, *i.e.*, a factory delivery. (Depo. of Peggy Fedgetter, pp. 32, 41; Depo. of Harry Womack, pp. 47, 121).

9. Sometime in February 1997, Harvey Mitchell, on behalf of Mitchell Coach Mfg. Co., transferred the Certificate Of Origin for a Vehicle ("MCO") for the motor home to WW which states:

I, the undersigned authorized representative of the company, firm or corporation named below, hereby certify that the new vehicle described above is the property of the said company, firm or corporation and is transferred on the above date and under the Invoice Number indicated to the following distributor or dealer ["WW, Inc."].

There was no recorded lien on the MCO. The MCO identified Invoice Number 409712V16, the invoice for the motor home. Mitchell sent Invoice Number 409712V16 to WW sometime in February 1997. (PE I; DE 31, Depo. of Harvey Mitchell, pp. 182–84).

10. It was the normal course of dealing between Mitchell and WW for WW to receive the MCO to apply for a certificate of title in exchange for full payment from purchasers at approximately the same time. WW would then remit to Mitchell the sales proceeds less WW's commission. (Depo. of Harry Womack, pp. 36–38, 114–15, 117, 120–21).

11. With the MCO as evidence of ownership, David Pharries ("Pharries"), a WW employee, and Stephens filed an Application for Texas Certificate of Title with the Guadalupe County Tax Assessor for transfer of the title to the motor home to Stephens with TexStar as 1st lienholder. The application indicated that the motor home was being transferred from its "previous owner," WW, to Stephens, with TexStar as 1st lienholder. No other lien on the motor home was identified in the application. (Depo. of Harry Womack, p. 56; Depo. of Ronny Stephens, pp. 22–24; Manu-

facturer's Certificate of Origin, PE. I; Application for Texas Certificate of Title, PE J).

12. The Guadalupe County Tax Assessor issued the Texas Title Application Receipt, or the "white slip," on February 28, 1997, representing that the motor home had been properly registered and a certificate of title would be forthcoming, which a WW employee took, along with a copy of the filed MCO, to Tex-Star. (Title Application Receipt, DE 11; Affidavit of Byron K. Bexley, DE 9). Based on the white slip and its belief that title passed unencumbered to Stephens, TexStar issued a check for $250,000.00 to WW with Stephens as remitter, which amount represented proceeds of a promissory note from Stephens to TexStar. (DE 13–A; Affidavit of Byron K. Bexley, DE 9).

13. WW deposited the $250,000 payment from Stephens and TexStar into its account at Pacific Southwest Bank ("PSB"), WW's floor plan lender. On February 27, 1997, Womack hand-delivered to Mitchell in Pryor a check from WW in the amount of $258,-430.00 drawn on PSB, representing the balance of the purchase price of the motor home due Mitchell from WW. (Depo. of Harry Womack, pp. 53–54; WW, Inc. Check No. 4607, PEK).

14. Before Mitchell negotiated the check from WW, PSB checked the inventory of WW and discovered that WW was out of trust, i.e., units had been sold by WW for which the lender had not received payment. Consequently, the lender swept WW's bank accounts on March 3 and March 4, 1997. As a result, when Mitchell deposited the check from WW for collection, the check was returned unpaid. (Depo. of Harry Womack, pp. 66, 68–71).

15. When Mitchell discovered that WW's check had been returned unpaid, Mark Molder, an employee of Mitchell, called Womack and advised him of the problem with WW's check. Over the course of the next few days Womack attempted to make arrangements to pay Mitchell, but was ultimately unsuccessful. (Depo. of Harry Womack, pp. 71–72, 81–82, 132–36; Affidavit of Harvey Mitchell, ¶ 4, PE E).

16. During the course of this same time period, approximately March 5 through March 8, 1997, Stephens was in Pryor to pick up the motor home and undergo instruction in operating the vehicle. While in Pryor, Stephens and his wife stayed in the motor home on Mitchell's premises. On March 6, 1997, Mitchell informed Stephens that WW's check was returned for insufficient funds but that WW was attempting to rectify the situation. On March 7, 1997, Mitchell informed Stephens that he would not be permitted to take the coach. (Depo. of Ronny Stephens, pp. 26–31; Depo. of Harvey Mitchell, pp. 127–28).

17. WW has not paid Mitchell in full for the purchase price of the motor home.[2] Mitchell continues to retain possession of the motor home. As the recorded first lienholder, TexStar has possession of the original certificate of title in the motor home. As the recorded owner, Stephens has possession of the duplicate original certificate of title in the motor home. (Depo. of Harvey Mitchell, p. 50; Depo. of Ronny Stephens, p. 40; Affidavit of Byron K. Bexley, DE 9; DE 11).

### *Summary Judgment Standard*

Summary judgment pursuant to Fed. R.Civ.P. 56 is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Windon Third Oil & Gas v. FDIC,* 805 F.2d 342, 345 (10th Cir.1986). In *Celotex,* the Supreme Court stated:

> [t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. 2548.

A party opposing a properly supported motion for summary judgment must offer

---

**2.** On April 17, 1997, WW filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas.

evidence, in admissible form, of specific facts sufficient to raise a "genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. 2505. Thus, to defeat a summary judgment motion, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Zenith,* 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. In its review, the Court must construe the evidence and inferences therefrom in a light most favorable to the nonmoving party. *Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992).

### Analysis

The parties have filed cross-motions for summary judgment. Mitchell claims it is the owner of the motor home and is lawfully entitled to possession of same and neither Stephens nor TexStar has any right, title or interest in and to the motor home; or in the alternative, Mitchell has a perfected purchase money security interest in and/or a statutory lien against the motor home, which interest is superior to any interest of Stephens and TexStar, and thus Mitchell is entitled to exercise the remedies provided under Article 9 of the Uniform Commercial Code. Stephens contends he is the owner of the motor home; TexStar claims a perfected purchase money security interest which secures the $250,000 it loaned to Stephens to

purchase the motor home. In the alternative, Stephens and TexStar claim equitable liens in the motor home.[3]

Mitchell contends and defendants now concede that Oklahoma law applies to the facts of this case pursuant to Section 1–105 of Oklahoma's Uniform Commercial Code ("OUCC"), 12A O.S. § 1–105.[4] Defendants, however, note that OUCC § 1–105(2) specifically excepts from its general choice of law rule the perfection provisions of § 9–103.1:

> Where one of the following provisions of this title specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law, including the conflict of laws rules, so specified:
>
> \* \* \* \* \* \*
>
> Perfection provisions of the article on Secured Transactions. Section 9–103.1 of this title.

12A O.S. § 1–105(2). The pertinent provision here is § 9–103.1(2) which states:

> (a) This subsection applies to **goods covered by a certificate of title** issued under a statute of this state or of another jurisdiction under the law of which indication or delivery for indication of a security interest on the certificate is required as a condition of perfection.
>
> (b) Except as otherwise provided in this subsection, **perfection and the effect of perfection or nonperfection of the security interest are governed by the law, including the conflict of laws rules, of the jurisdiction issuing the certificate** until four (4) months after the goods are removed from that jurisdiction and thereafter until the goods are registered in another jurisdiction, but in any event not beyond surrender of the certificate. After the expiration of that period, the goods are not covered by the certificate of title within the meaning of this section.

---

**3.** Defendants are no longer pursuing their fraud claim.

**4.** Section 1–105(1) sets forth the general rule regarding conflict of laws under the OUCC:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation

the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement, this title applies to transactions bearing an appropriate relation to this state. 12A O.S. § 1–105(1).

12A O.S. § 9–103.1(2). Defendants assert that § 9–103.1(2) applies to the instant transaction because a certificate of title on the motor home was issued by the State of Texas, and thus the Texas Certificate of Title Act (the "Texas Act"), Tex.Transp.Code § 501.001 *et seq.*, controls the "perfection and the effect of perfection or nonperfection" of any security interest in the motor home.

Mitchell argues that OUCC § 9–103.1(2) only comes into play if the Court determines that Mitchell transferred ownership but retained a security interest in the motor home. Mitchell claims that it did not transfer ownership as it never relinquished possession of the motor home. Mitchell relies on *General Finance Corp. v. Jackson*, 296 P.2d 141, 144 (Okla.1956), *Medico Leasing Co. v. Smith*, 457 P.2d 548, 551 (Okla.1969), and *In re Foster*, 611 P.2d 232, 235 (Okla.1980) for the proposition that possession of the motor home, not the certificate of title thereto, establishes ownership under Oklahoma law.

■ While the Court agrees that *Jackson* and *Medico* stand for the proposition that a certificate of title "is not a muniment of title which establishes ownership,"[5] these cases pre-date Oklahoma's adoption of a certificate of title system pursuant to the Oklahoma Vehicle License and Registration Act (the "Oklahoma Act"), 47 O.S. §§ 1101–1151.[6] Section 1103 of the Oklahoma Act expressly states that "[i]t is the intent of the Legislature that the owner or owners of every vehicle in this state shall possess a certificate of title as *proof of ownership....*" 47 O.S. § 1103 (emphasis added). *Foster*, one of the cases cited by Mitchell, in fact, recognizes this change in Oklahoma law. In *Foster*, the Oklahoma Supreme Court noted that prior to the enactment of the Oklahoma Act, effective July 1, 1979, Oklahoma was not a "title" state and certificates of title were "documents of convenience rather than documents of ownership." *Foster*, 611 P.2d at 234. Now, under the Oklahoma Act, certificates of title are "proof of ownership."

The recognition of the role certificate of title statutes are intended to play is noted in Comment 4 to OUCC § 9–103.1:

4. (a) Where the collateral is an automobile or other goods covered by a certificate of title issued by any state and the security interest is perfected by notation on the certificate of title, perfection is controlled by the certificate of title rather than by the law of the state wherein the security interest attached (subsection (2)).

(b) It has long been hoped that "exclusive certificate of title laws" would provide a sure means of controlling property interests in goods like automobiles, which because of their nature cannot readily be controlled by local or statewide filing alone. In theory **the certificate of title should control the property interests in the vehicle wherever the vehicle may be....**

12 O.S. § 9–103.1, cmt. 4 (emphasis added). To continue to view certificates of title as "documents of convenience" rather than "documents of ownership" contradicts the express language of the Oklahoma Act and the OUCC. The change in Oklahoma law effected by the Oklahoma Act is also recognized in *Security Nat'l Bank and Trust Co. v. Richardson*, 686 P.2d 293 (Okla.App.1984). In *Richardson*, the Oklahoma Court of Appeals agreed with the following statement by Professor Grant Gilmore in his treatise, Security Interests in Personal Property:

"But the consensus that gradually begins to emerge from the cases is the one that an astute observer would have predicted from the beginning: no interest will be recognized which is not evidenced by a certificate unless, on principles of law, equity and natural justice, it ought to be recognized even without the certificate: he who has the certificate has everything unless sound reasons of policy compel his subordination."

*Id.* at 295.

It is undisputed that Mitchell transferred the MCO for the motor home to WW so WW and Stephens could apply for a certificate of

---

**5.** *Jackson*, 296 P.2d at 144; *Medico*, 457 P.2d at 551.

**6.** Prior to 1985, the Act was set forth in 47 O.S. §§ 22–40.6.

title in the motor home from the State of Texas. It was the normal course of dealing between Mitchell and WW for WW to receive the MCO to apply for a certificate of title at approximately the same time as, and in exchange for, full payment for the motor home by the buyer. WW would then remit to Mitchell the sales proceeds less WW's commission. The MCO Mitchell transferred to WW expressly states that the motor home "is the property of [Mitchell] and is transferred on the above date [February 1997] and under the Invoice Number indicated to [WW]."

 Using the MCO as evidence of ownership, pursuant to § 501.025 of the Texas Act,[7] Pharries, a WW employee, and Stephens filed the MCO and an Application for Texas Certificate of Title with the Guadalupe County Tax Assessor for transfer of the title into the name of Stephens with TexStar identified as 1st lienholder. Pharries then took the Texas Title Application Receipt, or "white slip," which indicated legal title to the motor home in Stephens and a first lien in TexStar to TexStar. Relying on the white slip, TexStar issued a check for $250,000 to WW, the amount of its loan to Stephens. Defendants currently have possession of the original and duplicate original certificates of title to the motor home which identify WW as the "previous owner" and Stephens as the "owner."[8] (Affidavit of Byron Bexley, DE 9; DE 11). Thus, the undisputed evidence establishes that Mitchell transferred its "property," the motor home, to WW when it transferred the

MCO to WW, which WW, the "previous owner," in turn transferred to Stephens, the "owner." Mitchell's refusal to relinquish possession of the motor home does not vitiate the transfer of title, and the certificate of title of the motor home is proof of Stephen's ownership under both the Oklahoma and Texas Acts. In other words, the certificate of title in the motor home creates a presumption of Stephens' ownership of the motor home which is not rebutted by Mitchell's continued bald possession. *See Villa v. Alvarado State Bank,* 611 S.W.2d 483, 485 (Tex. Civ.App.1981) (certificate of title creates a presumption of ownership in the party whose name is on the title). Accordingly, the Court concludes that Stephens, and not Mitchell, is the owner of the motor home.[9]

Having so found, the Court is guided by Texas law in determining the "perfection and the effect of perfection or nonperfection" of the security interests in the motor home claimed by Mitchell and TexStar. 12A O.S. § 9–103.1(2)(b). Section 501.111 of the Texas Act, entitled Perfection of Security Interest, provides:

(a) Except as provided by Subsection (b), a person may perfect a security interest in a motor vehicle that is the subject of a first or subsequent sale only by recording the security interest on the certificate of title as provided by this chapter.

(b) A person may perfect a security interest in a motor vehicle held as inventory by a person in the business of selling motor

---

7. Section 501.025 provides:
 A county assessor-collector may not issue a title receipt on the first sale of a motor vehicle unless the applicant for the certificate of title provides to the assessor-collector the application for a certificate of title and a manufacturer's certificate, on a form prescribed by the department, that:
 (1) is assigned to the applicant by the manufacturer, distributor, or dealer shown on the manufacturer's certificate as the last transferee; and
 (2) shows the transfer of the vehicle from its manufacturer to the purchaser, whether a distributor, dealer, or owner, and each subsequent transfer from distributor to dealer, dealer to dealer, and dealer to applicant.
 Tex.Transp.Code § 501.025.

8. Section 501.027 of the Texas Act requires the Texas Department of Transportation to send an

original certificate of title to the first lienholder and a "duplicate original" to the owner.

9. Neither is Mitchell helped by UCC § 2–401 as to the transfer of title to the motor home. It is questionable whether a certificate of title is a "document of title" under the Texas Business & Commerce Code. The Fifth Circuit has held that "an MSO [MCO] and a certificate of title are not such 'documents of title' as that term is used in the Uniform Commercial Code," ... "[b]ecause they do not import bailee status." *In re C.M. Turtur Inv., Inc.,* 883 F.2d 35, 37 (5th Cir.1989). However, if the MCO were a "document of title" under the UCC, the Court concludes that title passed at the time and place of delivery of the MCO as the parties agreed that delivery of the motor home was to made at Mitchell's factory. Tex.Bus. & Com.Code § 2.401(3).

vehicles only by complying with Chapter 9, Business & Commercial Code.

Tex.Transp.Code § 501.111. The subject sale is a first sale.[10] It is undisputed that Tex-Star perfected its security interest as required under the Texas Act and that such interest is recorded on the certificate of title to the motor home. It is also undisputed that neither Mitchell nor WW disclosed any claimed lien in the Application for Texas Certificate of Title or in any way encumbered the MCO. *See* 47 O.S. § 1105(D)(1) ("a manufacturer's certificate of origin shall contain ... a statement of any security interests upon said vehicle"). No lien was recorded on the MCO and the only lien recorded on the certificate of title is that of TexStar.

Mitchell claims that § 501.111(a) does not apply to its lien because no certificate of title existed at the time its lien attached and the motor home is "inventory" under § 501.111(b); thus, Oklahoma law applies and Mitchell claims a statutory lien "dependent upon possession" under 42 O.S. §§ 91(A)(1) and 97 [11] which excepts its lien from recordation on the certificate of title. Further, even if the Texas Act does apply to the perfection of security interests in this case, there is a conflict between § 501.111 which requires recordation on the certificate of title and § 9.305 of the Texas Business & Commerce Code (the "TUCC") which allows perfection by possession, and any conflict must be resolved in favor of § 9–305. Tex. Transp.Code § 501.005.[12] Therefore, Mitchell asserts perfection of its purchase money security interest by possessing the "collateral" has priority over TexStar's recordation of

lien on the certificate of title to the motor home.

A purchase money security interest is a security interest that is "(1) taken or retained by the seller of the collateral to secure all or part of its price; or (2) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." Tex.Bus. & Com.Code § 9.107; 12A O.S. § 9–107. Tex-Star has a purchase money security interest in the motor home under TUCC § 9.107(2). Mitchell, however, contends that it has a purchase money security interest in the motor home under § 9.107(1) which has priority over TexStar's as it was perfected before TexStar perfected its interest by recordation on the white slip. Specifically, Mitchell asserts that its purchase money security interest was created, attached and was perfected at the time it transferred the MCO to WW, although no lien was noted on the MCO.

Mitchell's first argument is that § 501.111 of the Texas Act does not apply to the determination of perfection of its security interest because at the time its purchase money security interest attached and was perfected (when the MCO was transferred), there was no certificate of title upon which to record any security interest.

■ The Court rejects Mitchell's reading of the Texas Act. The Texas Act expressly covers "first sales" as well as "subsequent sales." The language of § 501.111(a) specifically includes perfection of security interests in motor vehicles that are the subjects of first sales, even though no certificate of title

---

**10.** The MCO also certifies "that this was the first transfer of such new motor vehicle in ordinary trade and commerce." (DE 11).

**11.** Section 91 provides in pertinent part:
Any person who, while lawfully in possession of an article of personal property, renders any service to the owner thereof by furnishing material, labor, or skill for the protection, improvement, safekeeping, towing, storage or carriage thereof, has a special lien thereon, dependent on possession, for the compensation, if any, which is due to him from the owner for such service.
42 O.S. § 91(A)(1).
Section 97 states:

Any person, firm or corporation who furnishes labor, money, material or supplies for the production of, altering or repairs of any personal property at the request of the owner of said property, shall have a lien for the value of his money, labor, material or supplies upon said personal property as provided for in Section 2 of this act. Lien to date from commencement of furnishing of labor, money, material or supplies.
42 O.S. § 97.

**12.** Section 501.005 of the Texas Act provides that "Chapters 1–9, Business & Commerce Code, control over a conflicting provision of this chapter."

yet exists. In the case of first sales, the applicant must list existing liens in the application for a certificate of title. As noted above, for issuance of a white slip, the temporary title document, § 501.025 requires the filing of an application for a certificate of title, which lists all liens, and a MCO which "(1) is assigned to the applicant by the ... [dealer] shown on the manufacturer's certificate as the last transferee; and (2) shows the transfer of the vehicle from its manufacturer to the purchaser, whether a distributor, dealer or owner, and each subsequent transfer from distributor to dealer, dealer to dealer, and dealer to applicant." Tex.Transp.Code § 501.025.

Mitchell next argues that Texas law does not apply because it falls within the exception to recordation on the certificate of title under § 501.111(b) as the motor home was held by WW as inventory at the time of Mitchell's transfer of the MCO; thus perfection is not effected by the Texas Act but by complying with Chapter 9 of Texas Business & Commerce Code. As Chapter 9 does not require perfection by notation on a certificate of title, the second prong of OUCC § 9–103.1(2) would not be met and the general rule under § 9–103.1(1)(b) would apply to choice of law concerning the perfection of Mitchell's security interest. Section 9–103.1(b) states:

> Except as otherwise provided in this subsection, perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

12A O.S. § 9–103.1(b). Mitchell concludes that as the motor home was in Oklahoma at all times, Oklahoma law and not Texas law applies to the perfection of Mitchell's security interest.

 The Court finds no merit in Mitchell's argument. Mitchell in essence argues

**13.** Also, Mitchell never recorded any purported lien on the MCO before transfer it to WW.

**14.** However, even if the Court were to find that Oklahoma law applies, the Court would reject Mitchell's claim of a "possessory statutory lien" pursuant to 42 O.S. §§ 91(A)(1) and 97. First,

that the specific provision under OUCC § 9–103.1(2) pertaining to "goods covered by a certificate of title" does not apply to the perfection of its security interest because the motor home was "inventory" at the time of attachment of its security interest and thus **not** a good covered by a certificate of title. This argument, however, overlooks TexStar's security interest in the motor home: when the motor home was sold to Stephens it was "covered by a certificate of title," although a temporary one, which reflected TexStar's security interest. In other words, when the "inventory" transformed into a "motor vehicle" upon sale, Mitchell should have "reperfected" its claimed interest in the motor home in accordance with the Texas Act.[13] Further, even assuming that the motor home was in WW's inventory at the time Mitchell's purchase money security interest attached and is **not** a good covered by a certificate of title, Texas law would still apply to the determination of "the perfection and the effect of perfection or nonperfection" of Mitchell's purchase money security interest under § 9–103.1(1)(c) which provides:

> If the parties to a transaction creating a purchase money security interest in goods in one jurisdiction understand at the time that the security interest attaches that the goods will be kept in another jurisdiction, then the law of the other jurisdiction governs the perfection and effect of perfection or non perfection of the security interest from the time it attaches until thirty (30) days after the debtor receives possession of the goods and thereafter if the goods are taken to the other jurisdiction before the end of the thirty-day period.

12A O.S. § 9–103.1(1)(c). It is undisputed that Mitchell, WW and Stephens understood at the time Mitchell transferred the MCO to WW that the motor home would be kept in Texas. Thus, the Court concludes Texas law would still apply to the issue of perfection of Mitchell's security interest.[14]

Mitchell did not assert any claim under these statutes until after the discovery deadline in this case. Second, Mitchell never submitted any proof of filing a lien within sixty days as required under 42 O.S. § 98 for the enforcement of a § 97 lien. Third, based on the facts cited above, Stephens is an "innocent, intervening purchaser

In addition, classifying the motor home as inventory at the time that Mitchell's security interest attached does not help Mitchell on the issue of perfection. Under Texas or Oklahoma law, the method of perfection of purchase money security interests in motor vehicles held as inventory is by filing, not possession. *See* 12A O.S. § 9–302; Tex.Bus. & Com.Code § 9.302. Thus, at best, Mitchell would have an unperfected purchase money security interest, while TexStar has a conflicting perfected purchase money security interest in the motor home which gives TexStar's interest priority. *See* 12A O.S. § 9–312(3); Tex.Bus. & Com.Code § 9.312(c).

Finally, Mitchell argues that § 501.111 of the Texas Act does not apply to the perfection of its purchase money security interest because there is an inherent conflict between the TUCC which allows for perfection by possession of collateral under § 9.305 and § 501.111 of the Texas Act which requires recordation on the certificate of title to perfect any security interest in a motor vehicle. And, pursuant to § 501.005 of the Texas Act, "Chapters 1–9, Business & Commerce Code, control over a conflicting provision of this [Act]." Tex.Transp.Code § 501.005.

The Court agrees that "[t]he [Texas] Business and Commerce Code and the [Texas] Certificate of Title Act both deal in part with the same subject matter, and are in pari materia, and must be considered together." *GMC Superior Trucks, Inc. v. Irving Bank & Trust Co.*, 463 S.W.2d 274, 276 (Tex.Civ.App.1971) (finding bank's prior lien recorded on the certificate of title superior to later artisan lien under § 9.310); *IDS Leasing Corp. v. Leasing Assoc., Inc.*, 590 S.W.2d 607, 611 (Tex.Civ.App.1979) ("[T]he UCC and Certificate of Title Act are in pari materia and must be construed together"); *Gallas v. Car Biz, Inc.*, 914 S.W.2d 592 (Tex.

App.1995), *writ denied* (1996) (sale of motor vehicle without certificate of title renders sale void and is not saved by the entrustment provision of TUCC § 2.403(b)). However, the Court finds no conflict to mandate deference to the TUCC. Section 9.303 states that a security interest is perfected "when it has attached and when **all** of the applicable steps required for perfection have been taken. Such steps are specified in Section 9.115, 9.302, 9.304, 9.305 and 9.306." Tex. Bus. & Com.Code § 9.303 (emphasis added). Although § 9.305 does · generally allow for the perfection of a security interest in collateral by possession, another of the "applicable steps required for perfection" is stated in § 9.302(a)(4) which specifically refers to the security interest claimed by Mitchell here—a purchase money security interest in motor vehicles. Section 9.302(a)(4) states that a financing statement need not be filed to perfect a purchase money security interest in consumer goods, "but notation on a certificate of title is required for goods covered by a statute referred to in Subsection (c)(2)...." One of the statutes specifically referred to in § 9.302(c)(2) is the Texas Act. "[I]n case of conflict between a general statutory provision and a special provision dealing with the same subject, the general provision is controlled or limited by the special provision, whether they are contained in the same act, or in different enactments." *GMC Superior Trucks*, 463 S.W.2d at 276. The specific provision relating to perfection of security interests in motor vehicles requires notation on a certificate of title under the Texas Act. In addition, the Comment to TUCC § 9.307 makes the following observation: "Note that under Section 9–302(3) [9.302(c) ] the filing provisions of this Article do not apply when a state has enacted a certificate of title law. Thus where motor

---

without notice," and thus any lien under § 91 is unenforceable against him. Finally, these statutes refer to mechanics' liens that arise from an owner's failure to pay for services, materials, etc. rendered at the owner's request, not private commercial liens which are created in transactions for the sale of goods. Stephens did not fail to pay for any services or materials, etc., rendered by Mitchell at Stephens' request. And, in any case, pursuant to these statutes, Mitchell would not have a lien for the value of the motor home

which it now claims. *Semke v. Security State Bank*, 603 P.2d 1112 (Okla.1979) (possessory lien statute does not establish a primary obligation but only a means of satisfying an obligation created when a party in possession renders a service to the owner for the compensation due from the owner). In short, this involves a sales transaction under the OUCC and not a mechanics' lien for services, materials or labor under 42 O.S. §§ 91(A)(1) and 97.

vehicles are concerned, in a state having such a certificate of title law, perfection will be under that law." Accordingly, both the Texas Act and TUCC recognize that perfection of purchase money security interests in motor vehicles is by recordation on the certificate of title. TexStar so recorded its lien; Mitchell did not. Therefore, TexStar's perfected purchase money security interest has priority over Mitchell's unperfected purchase money security interest in the motor home.

■■■ The Court also finds that Stephens takes the motor home free of any security interest claimed by Mitchell even if such were perfected by possession. Section 9.307(a) of the TUCC states:

> Except as provided by Subsection (d) of this section, a buyer in ordinary course of business (Subdivision 9 of Section 1.201) ... takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

Tex.Bus. & Com.Code § 9.307(a); *see also* 12A O.S. § 9–307(1). "Buyer in the ordinary course of business" is defined in § 1.201(9) as

> a person, who in good faith and without knowledge that the sale to him is in violation of the ownership rights or secured interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind....

Tex.Bus. & Com.Code § 1.201(9); *see also* 12A O.S. § 1–201(9). The undisputed facts establish that Stephens in good faith bought the motor home "in the ordinary course" from WW, "a person in the business of selling" motor homes, without knowledge of any ownership rights or security interest claimed by Mitchell. Further, Mitchell's possession of the motor home under the circumstances of this case is insufficient, as a matter of law, to establish constructive knowledge of any asserted ownership right or security interest by Mitchell. It was the understanding of the parties that Stephens would pick up the motor home at Mitchell's factory in Pryor, Oklahoma. Mitchell transferred the MCO to WW so that title to the motor home would be placed in Stephens' name. The Retail Buyer's Order, the sales agreement between WW and Stephens, expressly states:

> Title to said equipment shall remain with the seller (WW) until the agreed purchase price thereof is paid in full, in cash; thereupon, title to the within described unit passes to the buyer (Stephens) as of the date of payment, even though the actual physical delivery may not be made until a later date.

(Retail Buyer's Order, PE H). Stephens had no reason to believe that Mitchell was claiming any ownership right or security interest in the motor home. As a buyer in the ordinary course of business, Stephens takes free of any security interest created by its immediate seller under § 9–307(a). *Adams v. City Nat'l Bank and Trust Co.,* 565 P.2d 26 (Okla. 1977); *First Dallas County Bank v. General Motors Acceptance Corp.,* 425 So.2d 460 (Ala. Civ.App.1982), *aff'd,* 425 So.2d 464 (1983) ("Subsection (1) allows a 'buyer in the ordinary course of business' to take free of a security interest created by his seller because it is felt that such a buyer has the right to expect that a merchant has the power to sell the particular item and that the buyer will be able to retain the item free of any security interest created by the seller."). Because Mitchell's claimed purchase money security interest in the motor home is one created by WW, Stephens' immediate seller, Stephens takes free of Mitchell's interest.

■■■ Finally, the Court concludes that based on the undisputed facts Mitchell is estopped to claim any property interest in the motor home superior to Stephens or TexStar. There is no evidence that at the time of transfer and recordation of their respective ownership and lien interests in the motor home, Stephens or TexStar had notice that Mitchell claimed a lien in the motor home. Mitchell by its conduct created the circumstances which caused its loss. Mitchell engaged in a course of dealing with its dealer WW by which it transferred an unencumbered MCO to WW to induce TexStar to lend, and Stephens to borrow, funds to remit payment in full for the motor home, and to allow Stephens and WW to obtain a certificate of title in Stephens' name with a recorded first lien in favor of TexStar. In so doing, Mitchell is estopped to deny the transfer of ownership in and right to possession of the

motor home. *See Allied Finance Co. v. Ford Motor Co.*, 327 S.W.2d 696 (Tex.Civ.App. 1959).

Based on the above, the Court denies Mitchell's motion for summary judgment (Docket No. 31) and grants defendants' motion for partial summary judgment that Stephens is the owner of the motor home and TexStar's perfected security interest is superior to any lien claimed by Mitchell.[15] (Docket No. 36). Trial in this case is currently set for June 8, 1998 at 9:30 a.m. The Court directs the parties to submit a new Agreed Pretrial Order by Friday, June 5, 1998, reflecting the issues that remain to be tried.

IT IS SO ORDERED.

---

15. Based on the Court's ruling, Mitchell's motion in limine is moot (Docket No. 53).